## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**
Feb 16 2016, 9:30 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

---

ATTORNEY FOR APPELLANT

Craig A. Dechert
Kokomo, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Katherine Modesitt Cooper
Deputy Attorney General
Indianapolis, Indiana

---

# IN THE
# COURT OF APPEALS OF INDIANA

---

James Baldwin,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

February 16, 2016

Court of Appeals Case No.
34A02-1507-CR-865

Appeal from the Howard Superior Court

The Honorable William C. Menges, Jr., Judge

Trial Court Cause No.
34D01-1409-CM-703

**Pyle, Judge.**

# Statement of the Case

Appellant/Defendant, James Baldwin ("Baldwin"), appeals his conviction for Class A misdemeanor domestic battery.[1] He argues that there was insufficient evidence to support his conviction because there was no evidence that he intentionally touched his victim in a rude, insolent, or angry manner. We conclude that there was sufficient evidence that Baldwin touched his victim in a rude, insolent, or angry manner, and we affirm his conviction.

We affirm.

# Issue

Whether there was sufficient evidence to convict Baldwin of Class A misdemeanor domestic battery.

# Facts

In August of 2014, Melissa Rust ("Melissa") lived in Howard County in a house with Baldwin, her boyfriend of five years, and Danielle Rust ("Danielle"), her twenty-one-year-old daughter. On the night of August 17, 2014, Melissa had a stroke and was admitted to the hospital. Danielle, who was Melissa's power of attorney, spoke with Baldwin after the stroke. He told her, "I think I know what probably caused it. A couple of nights ago we were fighting, arguing[,] and I grabbed her and I pushed her on the bed[.] [H]er head hit the headboard[,] and her neck snapped forward." (Tr. 57). When he made

---

[1] IND. CODE § 35-42-2-1.3(a).

this statement, he made "a motion as if he [were] pushing her" and, to Danielle, "just didn't seem like he cared" or "had [] remorse." (Tr. 58). Danielle had previously witnessed him arguing with Melissa "several times." (Tr. 62).

[4] As Melissa's power of attorney, Danielle filed a complaint with the Kokomo Police Department regarding Baldwin. Officer Eric Fogg ("Officer Fogg") investigated the complaint. He spoke with Melissa in the hospital, and she told him that she did not remember anything from the night of her stroke. Officer Fogg also talked to Danielle, and she told him that she believed that Baldwin had been the cause of her mother's stroke, although she had not been present when the incident happened.

[5] Subsequently, on September 3, 2014, Officer Fogg questioned Baldwin at the house he shared with Melissa. During this questioning, which Officer Fogg recorded, the officer asked Baldwin whether he and Melissa had had any altercations prior to her stroke. Initially, Baldwin said that their last altercation had taken place four and a half months previously. However, he later said that they had argued the night before Melissa's stroke. According to Baldwin, Melissa had been intoxicated and upset with him, and she had "struck him about the head and face." (Tr. 50). Then, when he had tried to walk away and call the police, she had ripped the phone cord out of the wall. He told the officer that she had then started "striking him about the head and face[,] so he "grabbed her by the arms." (Tr. 50). At that time, according to Baldwin, she had "put her foot on his chest and pushed off." (Tr. 51). "[A]s a result of doing

that, [she had] hit her head on the headboard." (Tr. 78). Baldwin said that, after their fight, Melissa had complained of head pain.

[6] On September 8, 2014, the State charged Baldwin with Class A misdemeanor domestic battery.[2] Baldwin was released from custody pending trial but was ordered to have no contact with Melissa. The Sheriff's Department served Baldwin with the no contact order on October 27, 2014.

[7] Thereafter, on February 9, 2015, Melissa met with Donald Whitehead ("Whitehead"), the investigator for the Howard County Prosecutor, to provide him with a statement regarding her contact with Baldwin. During this encounter, which Whitehead recorded, Melissa denied that her stroke had been related to Baldwin. However, Whitehead asked her if Baldwin had ever hurt her or caused her pain, and she responded "yes." (Tr. 45).

[8] Subsequently, the trial court held a bench trial on May 20, 2015. At trial, Melissa claimed that her last altercation with Baldwin had occurred four-and-a-half to five months before her stroke. She said that, during that altercation, she had "[held] on [to] his arms and he [had held] on to her [wrist]." (Tr. 24). Then, she had "kicked off his chest and [her] head [had] hit the headboard." (Tr. 24). When asked who had initiated the altercation, she said that it had been "kind of equal." (Tr. 89). She also denied that anything had happened to her the day or night before she had had her stroke. However, she admitted that

---

[2] The charging information is not a part of the record.

Baldwin "like[d] to see how mad he [could] get [her] [and] how much [she could] take." (Tr. 90).

[9] Also at trial, the State introduced Facebook messages that Melissa had sent to a person with the username "Dayle Shutt."[3] (State's Ex. 5). In the messages, she had stated: "I remember that very well too[.] [Y]ou hur[t] me badly[.] I thought I wa[s] going to die[.] [I] believe that [] probably was when my carotid artery got torn[.] [T]hat wa[s] 5 months before my stroke[.]" (State's Ex. 5). Melissa had also written: "[Y]ou should have just finished me off when you were slamming my head." (State's Ex. 5). The user name Dayle had replied: "I never slammed your head on anything. I can't believe you just said that." (State's Ex. 5). Then, Melissa had responded: "on the headboard repeatedly []while you were [h]olding onto my face." (State's Ex. 5). Melissa had also sent the following messages to Dayle:

> I must not have ever been important to you[.] [T]hat should have been when I ended it[.] I thought you were going to kill me. [I was] tired had drank smoke and took repeated blows to the head[.] I still have a tender sore spot on the back of my head from that[.] [I]t hasn't gone away after all of these months.
>
> \*　　\*　　\*
>
> [WTF] are you trying to do to me? You must forget you did attack me because you didn't like something I said about another female[.]
>
> \*　　\*　　\*

---

[3] It is not clear from the record when these Facebook messages were sent.

> You hurt me horribly from repeatedly hitting my head[.]  I was so scared[.]  As soon a[s] I see you have seen this message[,] I'm getting rid of it[.]  I will never tell anyone about that night ever.

(State's Ex. 5) (grammar mistakes in original).  When the State questioned Melissa about the messages at trial, she admitted that the person she had been messaging had been Baldwin, although she also claimed that there was a possibility it had not always been him.

[10]    At the conclusion of the evidence, the trial court found Baldwin guilty of Class A misdemeanor domestic battery and sentenced him to 365 days with 339 days suspended to probation and credit for thirteen (13) actual days served.  Baldwin now appeals.

## Decision

[11]    On appeal, Baldwin argues that there was insufficient evidence to prove that he committed domestic battery because Melissa testified that he did not intentionally hurt her and because she testified that she was "kind of equal" to Baldwin in initiating the fight.  (Tr. 89).  Accordingly, he asserts that he did not touch her in a rude, insolent, or angry manner as required for the elements of the offense.[4]

---

[4] Although Baldwin notes Melissa's testimony that he did not intentionally hurt her, he does not argue that there was insufficient evidence of his intent.

The standard of review for a sufficiency of the evidence claim is that this Court should only reverse a conviction when reasonable persons would not be able to form inferences as to each material element of the offense. *Perez v. State*, 872 N.E.2d 208, 212-13 (Ind. Ct. App. 2007), *trans. denied.* We do not reweigh evidence or judge the credibility of witnesses. *Id.* at 213. In addition, we only consider the evidence most favorable to the judgment and the reasonable inferences stemming from that evidence. *Id.*

In order to convict Baldwin of Class A misdemeanor domestic battery, the State had to prove that he "knowingly or intentionally touch[ed] an individual who . . . is or was living as if a spouse of the other person . . . in a rude, insolent, or angry manner that results in bodily injury to the person." I.C. § 35-42-2-1.3(a).

Baldwin asserts that the State did not prove that he touched Melissa in a "rude, insolent, or angry manner." I.C. § 35-42-2-1.3(a). However, Danielle testified that Baldwin had told her: "A couple of nights ago we were fighting, arguing[,] and I grabbed her and I pushed her on the bed[.] [H]er head hit the headboard[,] and her neck snapped forward." (Tr. 57). The State also admitted several Facebook messages in which Melissa had written Baldwin and talked about him attacking her, hurting her, and "slamming [her] head." (State's Ex. 5). Accordingly, we conclude that the State produced sufficient evidence to support Baldwin's domestic battery conviction. His argument is a request for us to reweigh the evidence, which we may not do. *Perez*, 872 N.E.2d at 213.

Affirmed.

Baker, J., and Bradford, J., concur.